Next case is Zachary Treece v. Debra Treece Christine Hines v. Debra Treece On November 6, 2007, Dr. Michael Treece was a successful internal medicine physician in Jackson County. He was healthy, living life to the fullest, had net assets of over a quarter of a million dollars, and he was a proud father of two sons, Zachary, who was 19 at the time, and Jackson, who I believe was 15. On November 7, 2007, the very next day, Dr. Treece's life, as well as the life of his entire family, changed drastically. Because on that day, Dr. Treece suffered a massive cerebral hemorrhage that left him unable to practice medicine, to do anything for himself, bedridden in a wheelchair. He couldn't care for himself or his assets. As a result, in February 2008, his sister, Debra, was named the cleanly guardian of his estate and his person. On that date, the hearing, Zachary was present in court, and had no objection to his aunt being named the guardian of his father. And on that date, Zachary questioned the court and said, well, I want to be sure that my father is taken care of, and that me and my brother are taken care of financially now. And the court, very stupidly, said to Zachary on that day, I don't know what your father's financial situation now is going to be. Things are going to change. He's not working anymore, so I don't know what assets he has, but I want to remind you of that, that things now can change. And that's exactly what happened, Your Honor. One of the assets that Debra was charged to be in control of was an account that had been set up for Zachary when he was a young boy, an account under the Uniform Transfer to Microsaf, which I'll refer to now as the UTMA account, that the parties all agreed was set aside specifically for Zachary's education. When Debra became guardian of her brother, that account had approximately $61,000. And Debra, as the time went on, used the account to pay Zachary's expenses for his room and board, his tuition, his books, his personal spending money, car payments, his cell phone bills, life insurance, and ultimately to pay off his vehicle so that he owned it free and clear. Excuse me, when the vehicle was paid off, was it placed in his name? Yes, Your Honor, it was. Zachary had possession of this, it was a Toyota truck and a car, since he was in high school and had been the sole user and operator of this vehicle in high school and now in college. He was attending Illinois College in Jacksonville at the time with his father's CDA. Debra, in order to liquidate assets for Zachary, for his expenses, would sell stock and then use the cash to pay for Zachary's expenses. Zachary ultimately disputed the payments from his account for his everyday living expenses. He disputed everything that Debra had made except for payments for his tuition, his fees, and room and board. Zachary's position, he argued that Debra should have used his father's guardianship account and not his own educational account to pay for all these expenses. Because prior to the onset of his father's disability, his father had always paid for everything. And Zachary felt that as a result of that, he was a dependent on his father for his needs. Now, at the same time, Zachary also admitted that he was 20, 1920 at the time, he was healthy, not disabled mentally or physically, and was able to work. The hearings in this cause were completed on May 26, 2010. Dr. Treece died on June 17, 2010. Just a few weeks after the hearing was finalized, leaving Zachary and his brother as his sole heirs. It's important for the court to know that throughout the entire proceeding, the entire guardianship, Debra never, ever paid herself a fee of any kind for her brother's assets. And there is no allegations that she in any way misused any of the funds. Zachary filed suit against Debra and was awarded $29,576 plus attorney's fees and costs because the court found that Debra had breached her judiciary duty, not only to Zachary, but to her brother as well. It's our assertion that the law contradicts the finding of the trial court and that its decision was against the manifest way of the evidence that was presented. Under Illinois law, and I think both Mr. Cummings and I agree, that the Probate Act finds that there are certain duties of a guardian of a disabled person's estate and person. But as the common law states, the paramount duty, the paramount duty of a guardian of a disabled adult is to safeguard and conserve the funds for that person so they can be cared for. Especially in this case. Dr. Peace was 59 and a half at the time of his accident at CBA. No one had a crystal ball to know how long he could live. And he had been in rehab in Chicago, a very expensive place. By the time of the hearings in this case, he'd gone from a quarter of a million dollars to $60,000 discount. As we argue in our brief, not only does the Probate Act support what Debra did, but the Illinois Marriage and Dissolution of Marriage Act also defines educational expenses. It's not just limited to room and board and tuition, but also application costs, meals, transportation expenses, living expenses, insurance expenses. So those are all expenses that Debra rightfully would pay for as that was considered the UTMA money for educational purposes. But as I read the statute, there's no restriction on that money. And that's exactly true, Your Honor. Under the UTMA statute, the trustee of the account is... As long as it's for the benefit. Right. Anything. As long as it's for the benefit of the young person. That's exactly what happened here. It's just that during the trial court hearings, it was established and agreed to by the parties that the funds in that account were to be used for his education. The probably most important case for the trial court to consider in this action is the Berger case from the First District. It's rather similar to what happened here, in a way. In Berger, the guardian went about paying for the adult, non-disabled children of the ward, paying for their education, paying for trips, paying for clothing, paying for jewelry, because Mr. Berger was a wealthy man, and the guardian felt that his children should be able to maintain the same lifestyle that they had maintained prior to his disability. The court didn't agree with that, and the court found that any evidence of gifting by a disabled person prior to the onset of a disability is not relevant after a finding of disability. And there was no order here in this case as to how, there was no order for Dr. Treece to pay educational expenses? That's true, Your Honor. In the dissolution, there was no findings of any kind or order about who was to pay for the education. So that was just left out there? Exactly. However, there was the UTMA that had been informally designated. That's exactly correct. And the Berger court found it was irrelevant because of the way things had changed. In this case, that's Debra, and then in Berger, the guardian had to pay back all the money given to the children. In this case, that's the opposite. Debra used money not from the disabled ward's account, but from the child's account, in order to pay for his expenses for college. And we believe that it was against the evidence to find that she had reached fiduciary duty by doing that. In Illinois, we follow in terms of attorney's fees, because that was awarded attorney's fees against Debra as well. We follow the American rule that everyone pays their own attorney's fees, unless there has been a finding of willful or wanton malicious or tortious behavior of some kind. That's not what happened here. There was no willful or wanton misconduct. Debra acted solely to protect the disabled adult and used money from Zach's UTMA account, which she had the right to do, to pay for his education. As I said before, at the time when the hearings were over in this case, Godfrey Police's funds, liquid funds, were down to $60,000, and Zach had about $5,000 left in his UTMA account. I think that attorney's fees are wrong additionally here in this case, not only because Debra didn't reach fiduciary duty for her brother or her nephew, but also because she never used any of the money for herself. Debra paid herself, which she has the right to do, under the Probate Act. She never paid herself, never took a cent. Her attention was solely focused on caring for her brother and caring for her son and the rest of what she knew possibly. The day that Dr. Treece had that stroke, not only did his life change, he went from being successful, independent, living life to the fullest, to being totally dependent on the care of other people. His life changed that day, and Zach's life changed as well. Now, opposing counsel posited that Debra had to make a choice between which person she owed her allegiance to, either the nephew or the disabled adult. It's our position that the disabled adult, under the law, is the favored person and the person whose rights or assets should be protected, and that's what she did. Just because Zachary's standard of living changed doesn't mean that his father's money for his support should be used to keep him to the lifestyle to which he'd been accustomed. Things change. Debra was between a rock and a hard place in this case. Based on how she acted, either her disabled brother or his son would be out of money by the time the court heard him kick her out. She didn't have, like I said before, a crystal ball to know how long her brother would live. He was 59 1⁄2 at the time of the stroke. She had to plan for his long-term care as much as possible. Unfortunately, he had nothing to do with that because he died probably after the stroke took place. I submit to the court that even had Debra used the guardianship money, and not Zachary's money, to pay for his expenses, we would still be here today because of the fact that, like under Berger, the guardianship assets had been squandered for the benefit of the child. That's not what happened here. Zach's money was used for Zach. He received the benefit of everything that was paid for for him out of that account. He got a car. He got life insurance payments that were made. He admitted during the court hearing that he used some of the cash from the life insurance money that Debra had maintained to pay for his tuition at school. So he benefited from everything that she did. He had a car. It was free and clear. His insurance was kept intact. He went to college. He had spending money. He had credit cards. His cell phone was paid for. Everything was paid for, but from his own money and not from his disabled father. For that reason, we asked the court to reverse the finding in the trial court that Debra breached her fiduciary duty to her brother and to his son. Because under the law in Illinois, she didn't. I thank you for your consideration. I love every one of you. Thank you. Mr. Clemons? Morning, Your Honors. May it please the court. My client throughout this case has been Zachary Trace. And I can only characterize the history of the case and the facts as an extremely sad situation. Obviously, my client nor anyone else was happy about the situation that befell Dr. Trace. The problem in this case is the manner in which the guardian of Dr. Trace, his sister, the appellant in this case, Debra Trace, handled her duties, her guardianship duties. And my client and obviously the trial court, which agreed completely with my client, had a totally and completely different view than Debra Trace as to how this estate was administered and how it was handled. We felt that it was total and complete misuse. Are you talking about the money under the UTMA Act? Yes, Your Honor. Just that money? Yes. Not the estate? How she handled the rest of the estate. It's not involved. Right. And that was her law. It was mentioned that there was some agreement that this was to be used for education, even though it's not in the statute, I don't believe. It's used for education purposes only. Whose agreement was that? Was it in writing? And when was it made? At the beginning of the hearing, the parties all agreed. Which parties? Was he a minor at the time? When the case started, the trial judge was informed by the parties, Debra Trace, Zachary Trace, and then there was a guardian at Lytton for a time. Zachary was a minor at the time? No. Or was an adult? Not when the case started. Okay. He was about second year at Lytton. When the agreement was made, was he an adult? Well, it was an agreement to the court that the UTMA was intended for educational purposes. But I'm trying to figure out, who was the agreement? Who were the ones that agreed? There was testimony during the hearing that was held on over four days. All right. There was testimony by Darla Carnes. Darla Carnes is Dr. Trace's ex-wife, mother of Zach. That way back, I'm thinking she talked about early 90s, she and Dr. Trace decided very wisely to begin planning for their two sons' education, secondary education. And they set up the uniform, the UTMA account, and that the intention of that account was that this would put their sons through school. Over and beyond the requirements of the statute. Yes. Yes. But their intention was it was an educational fund. So I don't believe there's any disagreement in the trial court about that. And that's our problem in this case. Because when my client learns and gets an accounting of what's going on and starts to see what happens to his educational account, his UTMA account, he finds out his aunt, the guardian, has made payments for an insurance policy that he had on his life, made payments for insurance on this Toyota pickup truck. It'll be referred to in the record as a 2005 Toyota pickup truck. Made payments on his Visa credit card that his father had given him. Made payments on his cell phone account. Internet charges. Some of the internet charges were for the family residence. Now, let's back up. Was that Visa credit card in his name or his father's name? It was in both, Your Honor. Okay. So either one could use it. Yes. But his father had provided it to him actually in high school. Okay. And his father had always paid the charges on that account. There's no – you aren't contesting that Zachary benefited by the expenditures. Am I correct? Well, his bills got paid. I mean, that obviously – Well, he certainly was enjoying at least the fruits of the expenditures. Sure. But, see, the major problem, the thing that really brought my client to court, was his aunt pays off the loan on the pickup truck. And what happened to the truck? Well, then she transferred the title to him. And he's got the truck. The truck was a gift from his father when he was 17 years old. How did you prove that up? Pardon? How did you prove up gift? Well, we had a little problem with the Dead Man's Act. Right. Yeah, which is where I think the court was thinking. We explained, as Zachary explained, how he was taken to New Bowl, Toyota, and O'Fallon when he was a junior in high school, and they picked out a Toyota pickup truck. And from that point on, he was the one who always used it. I think that he might have loaned it to his dad for weekend gardening or something. But he always used it throughout high school, took it with him to Jacksonville. Also had it when he transferred to SIU Carbondale. Always used it. Never paid any payments on it. Then we found in the accounting of this estate that the guardian, Jack and Deborah Treece, had always listed the pickup truck as a debt of Dr. Michael Treece. And Dr. Michael Treece had always made the payments on the pickup truck. Always made the payments on the insurance for the truck. Always paid Zachary's life insurance. Always paid Zachary's cell phone bills. Always taking care of the visa. So it's your position that the truck should have been liquidated along with everything else at the time of his declaration? Well, it was a debt of his estate. Because you don't take money out of somebody's UTMA to be used for education to pay for a gift. Well, it was a gift that had not come to fruition because the father still had title and was still making payments on it. Sure, sure. And I think we can only speculate on that. Most parents don't turn over titles to 19, 20-year-old college kids. Some parents also at some point might say, well, you're not driving that car anymore. I know that happens, too. I want to kind of switch a little bit here to look at the language in the guardianship. Yes, Your Honor. In order for her to utilize his estate money, she would have to show that he was a dependent child, correct? Yes, and we believe and if you're right. And that's a legal definition, isn't it? Well, the statute under the guardianship provisions of 755 ILCS, and I'm referring to 5-11A-17 and 5-11A-18. Okay. There's two provisions. One's for guardian of the person, guardian of the estate, I believe is how they lay that out. In both of those, it talks about how the guardian is supposed to take care of adult-dependent children, but it's also to make provision for those adult-dependent children's education. So we believe that was a fact. She had to essentially continue to take care of that, and she also had to administer his UTMA account, because I'm sure as the Court's well aware of, you can't get at those until you're 21. Now, at no time did Ms. Treece attempt to go to the Court and say, you know, I'm having problems here. I'm having financial problems and I need some guidance on which bills need to be paid. Never did that. She did have guidance of legal counsel. She did testify. She had guidance of, I think at times, two different CPAs. Maybe she didn't because she thought an attorney read the UTMA language and didn't think there was a need. Well, part of that language also, Your Honor, gets into that being a guardian is not an easy job. No, it sure isn't. It's kind of a thankless job for the most part. There is a very, very high legal duty that meets the trial in court. I'm having a little trouble understanding. Can you gift something that you don't own? Can I give you like this pot here? I don't know. I can't give it to you, can I? Well, you're talking about the vehicle. Right. Now, who owned the vehicle? I'd say it was probably Toyota owned part of it, or the bank did. So they owned part of the vehicle. So can the father say, I'm going to give you this vehicle, or can he give him the vehicle that he doesn't own? The bank owns it. The bank would have to make the gift, wouldn't they? Well, the father. He owns a little piece of it. The father buys the vehicle. No, he doesn't. The bank owns it. And finances it. Right. He's got the use of the vehicle. Right. So obviously the bank has a lien. Right. Probably for pretty much. He says, here, it's yours to drive, to use, to do whatever you want. High school. And the bank's not going to object, as long as they pay the bills. As long as somebody sends that check. Right. Dr. Treese, from his own accounts, sends those checks. So as time goes on, he owns an eighth of the vehicle, a quarter of the vehicle. Right. And after it's paid off, not with Dr. Treese's estate money, but with Zachary's UTM money. Well, I'm saying, can he give more than the portion that he actually owns? Can he give a future? Oh, I think so, as long as he makes the payments. But he's not. Well, the only time he does make the payments is when he has a stroke. See, one of the things in the statute is that guardians are supposed to see what did my ward do during their lifetime, when they were able, when they weren't disabled. But there's a huge financial difference between what he was able to do in his lifetime and following the stroke. As I understand, and it's just, I think, from the appellant's brief, that he had income of about $1,900 a month following the stroke. I'm not positive, Your Honor. Obviously, his assets began to drop because of medical bills, principally. At the time of his death, where was he staying? He was down in the IANA Veterans Home. He was in the Veterans Home? Uh-huh. They have a nice facility down there. Wouldn't there be restrictions that would allow you to stay in the Veterans Home to restrictions on how you spend your money? I have no idea, Your Honor. No idea. But that would be a factor, I guess, the guardian would consider. The only thing I was aware of is you have to be a veteran to get in there. And there is a waiting list that way. Now, at the time, we still have the other child, who's still a minor, but I guess approaching college age? He's in high school during this whole period. Okay. But I presume that he probably has, with the family background, he probably would have plans also to attend college. I believe so. And under your argument, it would be basically first come, first served. So Zachary would use up the rest of the estate money, and he would then have no money. Well, I believe there was estate planning for Jackson, the younger brother. And his college money is tied up in other matters. We never got into much in this case about Jackson, because it really focused on what we believe to be an improper taking of this money in the UTMA. An improper expenditure, which is what the trial court found. Can I answer any other questions of the court? No, thank you. An interesting question. I keep thinking, can you give something? And I think, well, sure you can, because this is America where everybody finances everything. But you can only give maybe what you own. If you can't give something, don't ask. If you stop payments, it's going to be yanked back pretty quickly. People give wedding rings and cars and all kinds of things, and they say, here, it's a gift. It's for you. And then they go pay it off. But the son couldn't sell the car. He couldn't go out and sell it, could he? No. Because he didn't have title. Without the title and not with a lien on the property. Right. They could go out and sell that wedding ring, though. And a case. Might as well lien on that. Thank you, Your Honor. Okay. Thank you. Any rebuttal? Yes, Your Honor. The trial court in this order mistakenly found that Zachary was a dependent of his father because his father always paid all of his expenses. Now, the Probate Act does define the word dependent. Under Probate Act 755 IOCS 501-2.06, a dependent is defined as follows. A dependent means a person who is unable to maintain himself and is likely to become a public charge. That does not apply to Zachary Case. He was, as he admitted, healthy, able-bodied, could work, plus he had the funds set aside in his UTMA account to pay for his college education and his classes. There is no question in response to Justice Welch's case about the credit card being used. The bills that were paid for the credit card occurred after Dr. Fee's disability. He didn't have a credit card in the nursing home where he was living. So only Zachary charged expenses on the credit card. Clothing, meals, tickets, gas, everything. What's the internet charge? Are they contending that it was for the internet at the house? There was, that's correct, the house where Zachary lived when he was not at school, there was a computer there and internet charges for, I'm a computer ignorant, gaming boys, stuff like that. And that was paid as well until my client tried to find out more about these charges. The credit card company wouldn't tell her anything, and so she just canceled the card. And so it wasn't used anymore after that to protect her brother. The truck, the Toyota truck, was not a gift. Dr. Fee's retained ownership, title of it, but Zachary used it. He had it to use any time he wanted. The reason, the main reason, why the truck was paid off and given to Zachary is that Zachary had a crash with the truck and did not tell his aunt, the guardian, about it. She found out about it when she received a check from Toyota for the damages. And she immediately was very upset because she didn't want there to be any increased liability that would fall back against her brother as the owner of the truck, although he never used it. And so she paid off the truck and she, with Zachary's funds, let him have it. What's happened to it since then, we don't know. But it was his to use it as he wanted once it was paid off. The guardian did actually go to court, contrary to what counsel said, and got permission to sell Dr. Fee's interest in his medical practice building. That's in the brief and the record as well. So when money was needed for Dr. Fee's, she did go to court to get permission to sell his assets to help care for him. Justice Chapman has said after the disability was confirmed for Dr. Fee's social security, he was making $1,900 a month in social security disability income. That's all he had to live on but for his accounts for his care. What I believe, what the law states, the bottom line of this case is, whatever a disabled person did before the onset of the disability, they gave mint coats and diamonds and Cadillacs to their children. Of course the children would want that to continue, but that's not relevant because the onset of disability changes everything. The person is no longer able to support himself or his family in that kind of lifestyle. So what becomes paramount is the protection and safeguarding of his assets for himself. That's what Deborah did, and that's what we ask the court to reverse the findings of the trial court that she reached for the perpetrator's duty and have Dr. Fee's attorney speak as well. Thank you. Thank you. Thanks to both of you for your arguments and briefs, and we'll take the matter under advisement. We're going to take a short break right now before we take up the next case.